# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

GENE WILLIAMS FOR )
PAMELA J. TOWNSEND, deceased )
      Plaintiff, )
       )
      v. )     CAUSE NO.: 1:12-CV-153-JEM
       )
CAROLYN W. COLVIN, Acting Commissioner )
of the Social Security Administration, )
      Defendant. )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Pamela J. Townsend on May 15, 2012, and Plaintiff's Brief in Support of Plaintiff's Complaint to Review Decision of Commissioner of Social Security Administration [DE 22], filed by Plaintiff on January 3, 2013. Plaintiff requests that the January 18, 2012, partially favorable decision of the Administrative Law Judge ("ALJ"), granting benefits beginning on November 1, 2008 be reversed or, alternatively, remanded for further proceedings. For the reasons set forth below, the Court denies Plaintiff's request.

## PROCEDURAL BACKGROUND

On February 19, 2003, Plaintiff filed an application for disability insurance benefits ("DIB"), alleging disability due to rheumatoid arthritis, chronic anxiety, depression, lupus, and drug addiction with an alleged onset date of May 1, 2002. After Plaintiff's application was denied initially and upon reconsideration, a hearing was held in front of an ALJ on November 8, 2004, at which Plaintiff and her father testified. On February 25, 2005, the ALJ entered an unfavorable decision. On April 27, 2005, Plaintiff filed a Request for Review of Hearing Decision/Order. The Appeals Council denied review, and Plaintiff timely filed a complaint for judicial review. On May 14, 2007, the

United States District Court for the Northern District of Indiana remanded the case, holding that the ALJ erred by failing to discuss the testimony of Plaintiff's father in determining the credibility of Plaintiff's complaints regarding sleepwalking and panic attacks. *Order and Opinion, Townsend v. Barnhart*, No. 1:05-cv-277 (N.D. Ind. Nov. 28, 2006).

On September 11, 2007, the same ALJ held another hearing at which Plaintiff and her father testified. On July 21, 2008, the ALJ issued another unfavorable decision. On August 27, 2008, Plaintiff again filed a timely request for review with the Appeals Council. The Appeals Council determined that the ALJ's second decision did not comply with the court's order and remanded the case to a new ALJ. On May 6, 2011, the new ALJ held a third hearing at which Medical Expert Dr. Mark Farber testified. After Plaintiff's death on October 15, 2011, her father was made a substitute party. On January 18, 2012, the ALJ issued a partially favorable decision, finding Plaintiff disabled as of November 1, 2008, and granting Supplemental Security Income benefits as of that date. The ALJ's decision became the final decision of the Commissioner when the Appeals Council declined to assume jurisdiction. *See* 20 C.F.R. §§ 404.984(a), 416.1484(a). Under 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

**A.     Background**

Plaintiff was born on November 2, 1958, and was 44 on the date of her alleged disability onset.  She was a high school graduate.  Her past relevant work was as a store manager, a cashier, and a quality inspector.

**B.     Medical Evidence**

Plaintiff had a history of substance abuse, but had been sober since approximately August of 2001.

Plaintiff frequently complained of pain throughout her body.  In January and April of 2002, Plaintiff visited neurologist Dr. J.G. Panszi for complaints of short, sharp pain in the left temple. The tests Dr. Panszi ordered found no underlying cause, but he prescribed her medication to treat the pain.  In February 2003, Plaintiff reported to Dr. Sarah Thomas that she had been having "pain all over" beginning in October 2002.  Dr. Thomas referred Plaintiff to nurse practitioner Pamela Wright, who saw Plaintiff in April and July of 2003, for treatment for fibromyalgia and pain management.  In May of 2005, Plaintiff returned to Dr. Panszi for the same complaint of pain in the left temple, having started approximately six months earlier, and for headaches.  At a July 2005 visit, she expressed frustration with her difficulty in getting treatment because of her past substance abuse and because of conflicts with nurse practitioner Pamela Wright.  Dr. Panszi recommended another pain clinic, where records show Plaintiff began treatment in June 2006.  In August 2005, an MRI ordered by Dr. Panszi found no cause for her headaches.  A December 2005 examination by rheumatologist Dr. Anil Rao found no evidence of inflammatory arthritis.  He found her complaints

3

of pain consistent with fibromyalgia and chronic pain syndrome and recommended further laboratory testing and x-rays, which she refused.

No further records from Dr. Panszi exist in the record until January 2009, although he does mention in one record that Plaintiff had seen him in December 2007. In January 2009, Dr. Panszi noted her complaints of pain all over and difficulty walking and continued her prescriptions. He wrote that there was "no evidence of an acute neurological disorder." AR 785. On September 2, 2009, Dr. Panszi examined Plaintiff and wrote her a letter for her disability benefits application, stating he had been treating her for headaches and left temple pain, which were compounded by problems being treated by other physicians, including fibromyalgia, chronic pain syndrome, and arthritis. He further opined that Plaintiff "continue[d] to deteriorate with more pain, more weakness, and more disability" and would be unable to work. AR 747. The same day, he wrote a letter to Plaintiff's primary care physician, mentioning Plaintiff's headaches and temple pains and noting her continued treatment at a pain clinic for chronic pain problems. He also wrote that she reported falling because of tremors in her legs. In January 2009, Dr. Panszi prescribed Plaintiff a walker. Records submitted to the Social Security Administration from Plaintiff's pain management clinic date through September 2010. Plaintiff was prescribed numerous pain medications by the various physicians treating her for all of her complaints of pain throughout this time.

Several medical reports throughout the record, mostly from 2002 and 2003, note complaints of or confirmed presence of edema in Plaintiff's extremities. However, other records lack any indication of edema, and a June 2002 test found no active disease.

4

Plaintiff was also diagnosed for various mental health problems and was prescribed various medications to treat them. Records of mental health treatment begin with an increase in Plaintiff's Xanax prescription on February 26, 2002. A March 25, 2002, summary of Plaintiff's complaints to her physician at Anderson Area Medical Center includes notes that she complained of panic attacks, anxiety, poor sleep, and "feel[ing] sick all the time." AR 115. In September 2002, she reported to a physician at Anderson having been raped and held for two days without food or water a few weeks earlier and requested an increase in her medications to cope with the increased nervousness that resulted. In December 2002, Plaintiff was evaluated at Grant-Blackford Mental Health, where she was diagnosed with acute stress disorder, sleepwalking disorder versus parasomnia not otherwise specified, personality disorder, and cocaine abuse in sustained full remission. Her therapy sessions at Grant-Blackford often focused on stress Plaintiff experienced due to family issues. She also reported problems with insomnia, nightmares, and sleepwalking.

In August 2005, Douglas Babcock, Psy.D. performed a psychiatric evaluation for Plaintiff's Medicaid application. He reported that Plaintiff's short-term memory was slightly affected by anxiety, but her intermediate and long-term memory was adequate. He observed low energy, but stated he was unsure if Plaintiff was maximally motivated to participate in the evaluation since she was concerned about maintaining her Medicaid eligibility. Dr. Babcock diagnosed depressive disorder, recurrent mild anxiety disorder not otherwise specified (post-traumatic stress disorder and panic symptoms). Plaintiff reported having symptoms such as flashbacks and nightmares related to her rape, and also reported panic attacks four to five times a month. Dr. Babcock assessed a Global Assessment of Functioning ("GAF") score of 65, indicative of mild symptoms or difficulties

5

in functioning.  In August 2005, consultative examiner Ceola Berry, Ph.D., diagnosed post-traumatic stress disorder.

In a Mental Residual Functional Capacity Assessment completed in June 2003, state agency reviewing psychiatrist J. Pressner opined that Plaintiff had moderate limitations in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR182-83.  He, therefore, also found moderate limitations in the category of concentration, persistence, or pace in the Psychiatric Review Technique ("PRTF") form used to evaluate Listings for mental impairments.  However, in October 2005, Pressner completed another PRTF, noting only mild limitations in concentration, persistence, or pace, and concluding that Plaintiff's records did not "suggest a significant mental condition."  AR 504.  Plaintiff underwent another Medicaid psychiatric evaluation in December 2006, this time by Nana Berikashvili, M.D.  Dr. Berikashvili noted that Plaintiff had a history of major depressive disorder, but maintained a euthymic mood when taking her medications.  Despite flashbacks and nightmares due to a past rape, Plaintiff was able to sleep if she took her medications.  Dr. Berikashvili assessed a GAF score of 45, indicating serious problems, explaining that this rating took into account Plaintiff's physical problems with chronic pain and loss of function and her frustration with needing to be financially dependent on her parents.

Plaintiff reported to her therapist in March 2007 that she had no medication side effects and was getting adequate sleep without interruptions.  Again in June 2007, December 2007, and April 2008, she stated her medications helped and she received adequate sleep. In September 2008,

Plaintiff reported that she was depression-free while taking her prescribed medications. Her affect was full range and bright.

**C.       Plaintiff's Testimony**

Plaintiff testified at the first hearing November 8, 2004. That transcript begins abruptly in the middle of her testimony, apparently cutting off some of the discussion of her fibromyalgia, anxiety, and depression. The testimony that is recorded includes her statement that she needed help from her parents, with whom she had been living since about five years earlier, to care for herself. She said she had pain everywhere, rated it at a constant nine on a ten point scale, and said her medications did "not really" help. AR 231. Plaintiff testified that she had a history of crack cocaine use but had been sober for about four years. She stated there were no other conditions that they needed to discuss.

Plaintiff testified again at the second hearing on September 11, 2007. She testified that she was unable to sleep through the night, frequently did things in her sleep she did not remember the next day, and had bad nightmares which caused her to wake her parents with her screaming and from which it was difficult to calm down. She also testified to having headaches, which she rated at a pain level of seven out of ten, and said she had been experiencing them since before the first hearing. She said she had swelling in her legs that caused her pain, difficulty walking, and required that she raise her legs. She said a doctor had told her within the previous year to begin raising her legs and that recently prescribed medications to treat the swelling caused her to have to go to the bathroom frequently. She could not answer questions about how frequently or for how long she needed to raise her legs. She also testified to having used a cane since before the first hearing and falling down

7

about six times in the previous year.  Finally, she testified to being in constant pain, despite some help from her medications.

Plaintiff did not testify at the third hearing.

## D.    Plaintiff's Father's Testimony

At the first hearing on November 8, 2004, Plaintiff's father testified that he found Plaintiff sleepwalking "on a regular basis," and sometimes falling to the floor for no apparent reason.  AR 238.  He stated he was also sometimes awakened at night by her screaming during nightmares.  He also testified that "anything out of the ordinary" would cause Plaintiff to "work herself up into almost a frenzy," requiring about thirty minutes for her to calm down and most of a day to return to normal.  AR 239.  He said these episodes would happen about once or twice a week.

At the second hearing on September 11, 2007, Plaintiff's father testified that Plaintiff sleepwalked every night for the prior several years.  He also stated that he was awakened by Plaintiff's "frantic hollering" during nightmares about "once every couple of weeks" and more frequently when she was under stress, dating back approximately to her 2002 rape.  AR 1166.  Plaintiff's father further stated that Plaintiff had suffered from panic attacks starting around the same time, during which she would shake and cry and act frantically and from which it could take most of the day to recover.  He estimated that the panic attacks occurred about once a month but stated that Plaintiff's mother would know better.  Plaintiff's mother testified that Plaintiff's panic attacks had occurred two or three times a week in the prior month but less frequently before then.

Plaintiff's father did not testify at the third hearing.

8

**E.      Medical Expert Dr. Mark Farber's Testimony**

At the third hearing on May 6, 2011, Medical Expert Dr. Mark Farber testified based only on his review of Plaintiff's medical records. Dr. Farber noted various symptoms found throughout the record such as Plaintiff's alleged headaches, neurogenic pain in the left temple, cervical pain, lumboscral spine pain, leg tremors, falling, pain in the leg, and somnolence. He stated, however, that he could find no underlying diagnoses—other than possible psychiatric disorders to which he was not qualified to testify—to give an informed opinion in the case. Dr. Farber testified that the only diagnosable physical impairments supported by medical evidence available in the record were fibromyalgia and chronic pain syndrome. He stated that additional testing would be necessary to identify or rule out possible musculoskeletal or neurological disorders that would explain Plaintiff's falling. He recommended an MRI of the brain and spinal cord and an EMG of the upper and lower extremities. He concluded that if those tests ruled out physical sources of Plaintiff's symptoms, he would recommend further tests to determine if there were underlying psychological causes for her multitude of symptoms.

**F.      ALJ's Decision**

At the hearing, the ALJ expressed to Plaintiff's attorney her concern that many of Plaintiff's symptoms were unattributable to any existing diagnosis, preventing the ALJ from considering those symptoms in  making her findings. The ALJ gave Plaintiff the choice of holding open the record to obtain the additional physical and psychological testing recommended by Dr. Farber or altering her alleged onset date to November 1, 2008. If Plaintiff chose the option of changing her alleged onset date, the ALJ would find her disabled as of that date but could only grant Supplemental Security Income. Plaintiff chose to have the record held open.

Plaintiff submitted no additional test results.

The ALJ's decision was issued January 18, 2012.  She found a date last insured of June 30, 2006.  She found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  She gave great weight to Dr. Farber's testimony in finding that fibromyalgia and chronic pain syndrome were Plaintiff's only medically determinable physical impairments in the existing record. She also found fibromyalgia to be Plaintiff's only severe impairment.  Although acknowledging diagnoses for depression, post-traumatic stress disorder, acute stress disorder, sleep walking disorder, and anxiety disorder at various places in the record, the ALJ found that Plaintiff's mental impairments did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and were, therefore, not severe.  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or equaled an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.

The ALJ found that prior to November 1, 2008, Plaintiff had a residual functioning capacity ("RFC") for light work and was capable of performing her past relevant work.  Accordingly, she found Plaintiff not disabled prior to November 1, 2008. Starting November 1, 2008, however, the ALJ found Plaintiff had an RFC for sedentary work only, noting that Plaintiff's record indicated that she began to consistently use a cane at that time.  The ALJ found Plaintiff's reduced RFC prevented her from performing her past relevant work.  Plaintiff also had reached the age of fifty after this date. Given Plaintiff's closely approaching advanced age, education, and RFC, the Medical Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2 directed a finding of disability as of November 1, 2008. Because this onset date post-dated the date last insured, the ALJ awarded

Supplemental Security Income instead of DIB based on an application protectively filed on May 10, 2005.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings."

11

*White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review."  *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant

numbers in the economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC.  The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations."  *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (citing SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996); 20 C.F.R. § 404.1545(a)) (other citations omitted).  The RFC should be based on evidence in the record.  *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)).  The claimant bears the burden of proving steps one through four,

whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision based on the following arguments: (1) the ALJ failed to consider and evaluate Plaintiff's father's testimony as ordered on an earlier remand; (2) the ALJ's credibility determination was flawed; (3) the ALJ failed to incorporate limiting effects of Plaintiff's mental health impairments, headaches, and edema into Plaintiff's RFC; and (4) the ALJ failed to adequately articulate her reasoning for not finding at least a period of disability between May 1, 2002, and November 1, 2008.

## A.      Plaintiff's Father's Testimony

Plaintiff first argues that the Commissioner has yet to comply with the 2006 remand order because the ALJ did not adequately consider and evaluate the testimony of Plaintiff's father, Gene Williams, regarding Plaintiff's sleepwalking and panic attacks.  Plaintiff cites cases from the Eighth and Ninth Circuits to support the proposition that an ALJ must give specific reasons for rejecting each lay witness's testimony.  *See Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996); *Regenniter v. Comm'r of Social Security*, 166 F.3d 1294 (9th Cir. 1999); *Ricketts v. Secretary of Health and Human Services*, 902 F.2d 661, 663 (8th Cir. 1990); *Smith v. Heckler*, 735 F.2d 312, 317 (8th Cir. 1984); *Basinger v. Heckler*, 725 F.2d 1166, 1170 (8th Cir. 1984).  Case law in this Circuit, however, does not require an ALJ to specifically address a lay witnesses's testimony when it is  "essentially redundant" of other evidence in the record that the ALJ has otherwise already addressed, reasoning that redundant testimony does not constitute a separate line of evidence such that a failure to address it would prevent the Court from tracing the path of the ALJ's reasoning.  *See Carlson v. Shalala*,

14

999 F.2d 180 (7th Cir. 1993) (holding the ALJ did not commit error by ignoring Plaintiff's wife's testimony because it was "essentially redundant" of Plaintiff's own testimony, which ALJ did address)(citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985); *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984)); *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) (reasoning that ALJ "necessarily" found brother's testimony regarding Plaintiff's pain and limitations not credible when he found Plaintiff's own testimony regarding the same not credible); *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994) (holding that "the ALJ did not err in failing to mention reasons for rejecting [Plaintiff's wife's] testimony" because "the ALJ addressed the issues raised by [her] in relation to [Plaintiff's] testimony"); *see also Rasnick v. Astrue*, No. 1:11-cv-00283, 2012 WL 3779124, at *16 (N.D. Ind. Aug. 30, 2012) ("If testimony is 'redundant,' an ALJ does not need to independently evaluate it, since the testimony is not a separate line of evidence.").  In fact, the 2006 remand order cited these very cases in holding that the original ALJ did not err in failing to discuss Williams' testimony regarding other of Plaintiff's alleged impairments.

In the current decision, the ALJ acknowledges Williams' testimony, albeit without commentary, in the same sentence she mentions Plaintiff's own complaints of sleepwalking and panic symptoms.  The ALJ then spends two full paragraphs discussing Plaintiff's mental health records, noting records of sleep disturbances, panic attacks, and nightmares but also finding that the records show those problems to be intermittent or responsive to medication.  Unlike the first ALJ's decision, which made no mention of Plaintiff's sleepwalking and panic attacks, the most recent ALJ "sufficiently articulate[d] [her] assessment of the evidence" pertaining to Plaintiff's sleepwalking and panic attacks to make it possible for the Court to "trace the path of the ALJ's reasoning." *Carlson*, 999 F.2d at 181.  The 2006 remand order and Seventh Circuit case law do not require the

level of specificity desired by Plaintiff in assessing Williams' testimony. *See id.* (stating that an ALJ "need not evaluate in writing every piece of testimony" as long as the Court can "trace the path of the ALJ's reasoning"). Therefore, the ALJ committed no error by not addressing Williams' testimony more explicitly.

**B.      ALJ's Credibility Finding**

Plaintiff argues that the ALJ's credibility finding is erroneous because it uses "disapproved boilerplate credibility language" without then specifying which of Plaintiff's statements were not credible. The Commissioner counters that the ALJ's credibility determination was well reasoned and supported by evidence in the record.

In making a disability determination, an ALJ considers a claimant's statements about her symptoms and their effect on her ability to work. *See* 20 C.F.R. § 404.1529(a). The regulations provide a two-part test for determining the effects of pain or other symptoms on a claimant's ability to work: (1) the ALJ must determine whether there is a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and if there is, (2) the ALJ must consider the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the claimant's capacity for work. 20 C.F.R. § 404.1529(b), (c).

If the claimant alleges the intensity, persistence, or limiting effects of the symptoms are greater than objective medical evidence alone can prove, however, the ALJ must determine whether the claimant's allegations are credible. 20 C.F.R. § 404.1529(c). Social Security Ruling 96-7p instructs the ALJ on how to make this credibility finding. It provides that the ALJ must consider the record as a whole, including "medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or

examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong," that is, that it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). However, to create the necessary "logical bridge" between the evidence and the conclusion, the credibility finding must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

In this case, the ALJ assessed the credibility of Plaintiff's statements about symptoms related to her mental health—including complaints of sleepwalking, panic symptoms, and post-traumatic stress disorder symptoms—as part of her finding Plaintiff's mental impairments not severe at Step Two. As part of the ALJ's RFC determination, the ALJ evaluated the credibility of Plaintiff's statements about her physical symptoms, which included joint and muscle pain and leg tremors that caused her to fall. The ALJ further noted that Plaintiff claims these symptoms caused extreme limitations in her activities of daily living, including not being able to walk even a short distance without an assistive device and needing transportation and financial help from her parents. The ALJ gave great weight to Dr. Farber's hearing testimony that the only physical diagnoses supported by the evidence in the record were fibromyalgia and chronic pain syndrome. The ALJ found that Plaintiff's fibromyalgia could reasonably be expect to cause most of Plaintiff's physical symptoms except, as Dr. Farber testified, her alleged falling. As to the remaining physical symptoms, the ALJ accepted Plaintiff's allegations as they related to the time after November 1, 2008, as "generally

credible," leading to an award of benefits after that date.  AR 259.  However, the ALJ found Plaintiff's statements regarding their intensity, persistence, and limiting effects prior to November 1, 2008, "not credible to the extent they are inconsistent with the residual functional capacity assessment."  AR 258.

This and similar boilerplate language has, as Plaintiff notes, repeatedly been held to fall below the minimum articulation required to create the logical bridge between the evidence and the credibility finding.  *See, e.g., Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012); *Shauger v. Astrue*, 675 F.3d 690 (7th Cir. 2012); *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011).  "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination."  *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013).

In this case, in discounting the limiting effects of Plaintiff's alleged sleepwalking and panic symptoms, the ALJ notes numerous reports from treating and consulting physicians that indicated Plaintiff was able to sleep without problems and was free of depression when taking her medications.  The ALJ also cited various psychological evaluations in which mentions of sleepwalking and panic attacks were notably absent or were responsive to medications.  She also noted that a psychologist who reported slight anxiety-related short-term memory problems while evaluating Plaintiff on referral for the local Medicaid office was "unsure if she was maximally motivated to participate in the evaluation, since she was concerned about maintaining her Medicaid eligibility."  AR 256.

In partially discrediting Plaintiff's statements regarding the disabling effects of her physical symptoms prior to November 1, 2008, the ALJ cited information from treating physicians, including

18

a report from a rheumatologist who found no evidence of inflammatory arthritis and who noted Plaintiff's refusal to submit to further diagnostic testing he recommended.  She also cited medical records in which Plaintiff reported that medications made her pain manageable prior to November 2008.  The ALJ also considered the fact that a walker was first prescribed in January of 2009.

Although Plaintiff argues the ALJ's credibility analysis is insufficient because "[f[ew, if any, specific statements were analyzed on a credibility basis," she points to no authority that requires an ALJ to provide a scorecard analyzing every specific statement a claimant has made regarding symptoms.  Credibility findings need only be reasoned and supported.  *Elder*, 529 F.3d at 413-14. Further, Plaintiff gives no examples of specific statements she believes should have been explicitly evaluated, leaving the Court to guess at whether a more specific analysis would have altered the outcome of the ALJ's disability determination.  Because the ALJ considered the evidence noted above, drawn from throughout the entire record, this is not a case in which the credibility determination "lacks any explanation or support." *See Elder*, 529 F.3d at 413-14.  Therefore, the ALJ's credibility findings are not "patently wrong" and do not provide a basis for remand.

## C.    Plaintiff's RFC

Plaintiff next argues that the ALJ erred by ignoring entire lines of evidence, resulting in an incorrect RFC.  An RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon*, 270 F.3d at 1178. An ALJ must consider all relevant evidence in the record in determining a claimant's RFC and "may not ignore an entire line of evidence that is contrary to her findings." 20 C.F.R. § 404.1545(a);  *Zurawski*, 245 F.3d at 888. When "considerable evidence" contradicts the ALJ's determination, the ALJ must offer at least "a minimal level of articulation . . . as to his assessment of the evidence." *Zalewski v. Heckler,* 760

F.2d 160, 166 (7th Cir. 1985).  An ALJ does not, however, need "to address every piece of evidence or testimony in the record" as long as a reviewing court can trace the path of her reasoning. *Zurawski*, 245 F.3d at 889.

First, Plaintiff argues that evidence of her alleged edema was ignored by the ALJ and should have had some impact on the RFC assessment.  Plaintiff argues that "[e]dema affects one's ability to stand and often requires extra breaks to elevate the lower extremities," and that the medication to treat edema "often requires one to take extra breaks to urinate."  Plaintiff points to scattered records in which edema was noted by treating physicians.  However, none of the medical records she cites discusses her edema in any depth or contains any indication of the effects of edema on this particular Plaintiff's functioning.   No medical records mention a need to elevate her legs.  The only evidence cited by Plaintiff of edema's effects in her particular case is her testimony at the hearing on September 11, 2007, where she stated she needed to elevate her legs, that the swelling was painful and made it difficult to walk, and that she needed to take frequent bathroom breaks because of the medications used to treat her edema.  The ALJ addressed Plaintiff's pain and ability to walk generally in the credibility determination, finding them not as limiting as Plaintiff's testimony suggests.  Plaintiff was unable at the hearing to answer questions about how often or for how long she needed to elevate her legs.  She also stated that her doctor had first advised her to raise her legs and that she had developed the need for frequent bathroom breaks within the prior year, after her date last insured.  Plaintiff failed to meet her responsibility of providing the ALJ with enough evidence of her edema's effects to require the ALJ to incorporate them into Plaintiff's RFC.  *See* 20 C.F.R. § 404.1514; *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991) (stating that the claimant has the responsibility of providing the medical evidence to prove disability).  That any effects from

edema were not incorporated into the RFC does not, therefore, make the evidence relied upon by the ALJ any less substantial. That the ALJ did not more explicitly address the sparsity of evidence also does not prevent this Court from tracing the path of the ALJ's reasoning, the articulation of which demonstrated a consideration of the record as a whole, including evidence contrary to her determination.

Plaintiff also argues that the ALJ erred in failing to include limiting effects from Plaintiff's alleged headaches in her RFC. She argues, "Headaches affect one's ability to concentrate and requires [sic] one to avoid headache triggers in the work setting." However, Plaintiff again does not provide any explanation of how headaches affected her concentration or what triggers she needed to avoid. Further, at the hearing, Dr. Farber mentioned Plaintiff's headaches and temple pain in the list of symptoms for which he could find no underlying explanation. Plaintiff did not submit to the additional testing Dr. Farber recommended in order for the ALJ to better understand the origin of her array of symptoms. An ALJ need not consider in her RFC determination the effects of alleged symptoms for which no medically determinable impairment exists that could reasonably be expected to produce them. 20 C.F.R. § 404.1529(b). Further, the ALJ was clear in her decision that she relied heavily on Dr. Farber's testimony in making her findings. Therefore, this Court is able to trace the path of her reasoning for not including effects of headaches in Plaintiff's RFC to that reliance, even if the ALJ did not give more explicit reasons.

Finally, Plaintiff objects to the ALJ's not including the limiting effects of Plaintiff's mental impairments in her RFC. After a detailed discussion of the record regarding Plaintiff's mental impairments at Step Two of her analysis, the ALJ found that Plaintiff's mental impairments were not severe because they "did not cause more than minimal limitations in [her] ability to perform

basic mental work activities." AR 256.  The ALJ repeated this conclusion in a single sentence with no additional elaboration at the end of her RFC analysis in explaining why she included no limitations from mental impairments in Plaintiff's RFC.  Plaintiff argues conclusorily that the mild functional limitations the ALJ found at Step Two "[c]ertainly . . . would have had some material limiting effects related to concentration, pace, and stress level of many jobs, not to mention the impact on attendance from the intensification of psychological symptoms."  Plaintiff's statement is best construed as an argument that the ALJ failed to adequately articulate her consideration of limitations from Plaintiff's mental impairments in her RFC analysis.  Plaintiff correctly points out that even non-severe impairments must be considered in determining a Plaintiff's RFC.  The ALJ's sentence at the end of her RFC assessment shows that they were, in fact, considered at the RFC stage.  While the single sentence at the end of the RFC assessment may have been inadequate by itself, the earlier discussion at Step Two provided ample articulation for this Court to trace the path of the ALJ's reasoning in determining that Plaintiff's mental impairments caused no significant work-related limitations.  Plaintiff's conclusory argument lacks reference to any specific evidence that would give this Court reason to find that these conclusions were not supported by substantial evidence.

Because none of Plaintiff's arguments are availing, the Court finds the RFC is supported by substantial evidence and that no errors of law were committed in making the determination.

**D.     Period of Disability**

Finally, Plaintiff argues that the ALJ should have found at least a closed period of disability some time between her alleged onset date of May 1, 2002, and the November 1, 2008, onset date ultimately found by the ALJ.  More specifically, Plaintiff argues that "a strong argument can be

22

made" that such a closed period of disability was warranted from the time she was raped in September 2002, through June 1, 2004, because her sleepwalking and other difficulties sleeping were at their worst during that period.  The evidence cited, however, is not as strong as Plaintiff contends, consisting of records noting difficulty sleeping and an inference of frequent sleepwalking made based on a note that a change in medications had decreased the frequency of episodes.  Even if a strong argument could be made that Plaintiff was disabled during this period, it does not follow that ALJ's determination that Plaintiff's disability did not begin until November 1, 2008, was not supported by substantial evidence.  The substantial evidence standard requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gudgel*, 345 F.3d at 470.  "If reasonable minds can differ as to whether [Plaintiff] is disabled, we must uphold the decision under review." *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).  The ALJ's decision specifically addressed Plaintiff's sleep-related problems during this period of time, noting that records showed Plaintiff reported improved sleep and "being aware of what she was doing at night" after receiving a new prescription in December 2002.  AR 255.  None of the evidence cited by Plaintiff of sleep problems during her proposed period of disability so overwhelms the evidence cited by the ALJ to conclude that no reasonable mind could have sided with the ALJ on this issue. Therefore, her determination that Plaintiff was not disabled for any twelve month period prior to November 1, 2008, was supported by substantial evidence.

**CONCLUSION**

Based on the foregoing, the Court hereby **DENIES** the relief requested in Plaintiff's Brief in Support of Plaintiff's Complaint to Review Decision of Commissioner of Social Security Administration [DE 22] and **AFFIRMS** the Commissioner of Social Security's final decision.

SO ORDERED this 23rd day of September, 2013.


s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT


cc:  All counsel of record